**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| **DALLAS J. STEWART,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No. 1:10-cv-00032** |
| **v.** | ) | **Judge Trauger / Knowles** |
| | ) | |
| **LES HELTON, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

### I. Introduction and Background

This matter is before the Court upon Defendants' Motion for Summary Judgment. Docket
No. 113. Along with that Motion, Defendants have contemporaneously filed a supporting
Memorandum of Law and a Statement of Undisputed Facts, along with Excerpts of Plaintiff's
Deposition, and the Affidavits of Sabrina Patterson and Felicia McGee. Docket Nos. 114-118.

Plaintiff has filed a Response and the Affidavits of himself and Deborah Stewart Harris.
Docket Nos. 124-126. Plaintiff has not, however, filed a response to Defendants' Statement of
Undisputed Facts, or submitted his own Statement of Undisputed Facts.

Defendants have filed a Reply. Docket No. 129.

Plaintiff, a pre-trial detainee held at the Marshall County Jail at all times relevant to the
case at bar, filed this pro se, in forma pauperis action pursuant to 42 U.S.C. § 1983, alleging that
Defendants were deliberately indifferent to his serious medical needs and negligently failed to
protect him from inmate McKnight, who assaulted Plaintiff and broke his nose. Docket Nos. 1,
81. Specifically, Plaintiff avers that Defendants were deliberately indifferent to treating his

1

broken nose and that Defendants negligently failed to protect him from inmate McKnight when they placed them in the same Pod, after being aware that threats had been made against Plaintiff. *Id.* Plaintiff sues Southern Health Partners, former Marshall County Sheriff Les Helton, Marshall County Jail Administrator Sabrina Patterson, and former Marshall County Jail Correctional Officer Gary Barron, in their individual capacities.[1] *Id.* Plaintiff seeks $25,000 in compensatory damages and $50,000 in punitive damages from each Defendant. *Id.*

Defendants filed the instant Motion and supporting materials on March 14, 2012. Docket Nos. 113-118. Defendants maintain that they are entitled to summary judgment because the allegations of Plaintiff's Amended Complaint "fall significantly short of establishing deliberate indifference," particularly because Plaintiff himself admits that he received medical treatment. Docket No. 114. Specifically, Plaintiff's sworn testimony demonstrates that he was seen by a physician and a nurse on the morning after he was hit in the nose; that an appointment was made for Plaintiff to see an ENT specialist; that Plaintiff was seen by several physicians before ultimately undergoing surgery.[2] *Id.*

Defendants argue that Plaintiff simply cannot establish either requisite element of his deliberate indifference claim because Plaintiff does not even allege that there was a delay in treatment that resulted in any harm, and because there is no evidence in the record of any risk of

---

[1]Southern Health Partners was terminated as a Defendant in this action on December 17, 2010. *See* Docket No. 45. Additionally, Plaintiff originally sued Defendants in their individual and official capacities. Docket No. 1. Plaintiff filed an Amended Complaint on November 4, 2011, however, in which he sues Defendants in their individual capacities only. *See* Docket No. 81.

[2]Defendants note that Plaintiff filed this action prior to completing his medical treatment. *Id.*

serious harm to Plaintiff. *Id.* Defendants further argue that there is nothing in the record to indicate that the instant Defendants were either aware of Plaintiff's broken nose on the evening of the incident or that the instant Defendants were somehow put on notice of any serious medical need. *Id.*

Defendants argue that, in order for them to be found individually liable for a § 1983 civil rights violation, Plaintiff must establish that they either directly participated in the conduct that allegedly violated his rights, or authorized, approved, or acquiesced in the activity. *Id.* Defendants contend that Plaintiff cannot do so, as Plaintiff has not even alleged that Defendants Helton or Barron had any knowledge of Plaintiff's broken nose or treatments, or took any action or inaction with regard thereto. *Id.* Defendants note that Defendant Helton is never even mentioned in the factual allegations pertaining to Plaintiff's medical needs, and that the only reference to Defendant Barron is that Defendant Barron gave inmate McKnight two food trays. *Id.* Defendants Helton and Barron maintain that they cannot be held liable based on these allegations. *Id.*

With regard to Plaintiff's allegations against Defendant Patterson, Defendants argue that Plaintiff simply avers: (1) that Dr. Matthews told Plaintiff that Defendant Patterson would have to give her approval for the Jail to pay for Plaintiff to see an ENT specialist; and (2) that Defendant Patterson initially denied Plaintiff's request to see a specialist, but later approved it. *Id.* Defendant Patterson notes that Plaintiff actually saw two different specialists: Dr. Stewart and Dr. Marvel. *Id.* Defendant Patterson argues that Plaintiff's allegations do not rise to the level of a constitutional violation, and that, accordingly, Plaintiff cannot sustain his claims against her.

With regard to Plaintiff's claims that Defendants negligently failed to protect Plaintiff by placing Plaintiff in the same pod as inmate McKnight, despite knowing that Plaintiff had been threatned, Defendants argue first that they are immune and are not the proper parties for purposes of a negligence action. *Id.* Defendants also argue that Plaintiff cannot establish that inmate McKnight was known by them to be a risk to Plaintiff, or that a reasonable correctional officer would have recognized that inmate McKnight would assault Plaintiff. *Id.* Specifically, Defendants note that Plaintiff admits that he had been in the E Pod with inmate McKnight on a number of occasions prior to the day of the assault, without incident, and that Plaintiff admits that he never had any communication with the instant Defendants about inmate McKnight specifically being a threat to him. *Id.* Defendants argue that Plaintiff's verbal complaint about inmate McKnight to Sgt. Kerbo, made seven to eight months prior to the assault, does not impute knowledge to them.[3] *Id.* Defendants also note that Plaintiff's written complaint alleging that there were inmates threatening him did not mention inmate McKnight by name or nickname. *Id.*

Defendants further contend that when Plaintiff and inmate McKnight got into their altercation, Plaintiff had several opportunities to press the call button for assistance, but chose not to do so. *Id.* Defendants note that Plaintiff himself thought the incident was over after inmate McKnight walked away, and that he did not foresee that the inmate would return and break his nose. *Id.* Defendants contend that if Plaintiff himself did not forsee that the inmate would return and break his nose, neither could any reasonable correctional officer. *Id.* Defendants argue that, accordingly, they cannot be liable for any negligent failure to protect. *Id.*

_____

[3]Sergeant Kerbo is not a party to this action.

Plaintiff responds that his injuries were "sufficiently serious" to support his claims, as is evidenced by the fact that they ultimately warranted reconstructive surgery. Docket No. 124. Plaintiff argues that his nose was broken at approximately 6:00 pm; that he was given only an ice pack that evening; and that he had to wait until the following day to be treated by a trained medical professional. *Id.* Plaintiff contends that, "Even if defendants Helton an [*sic*] Patterson were not immediately aware of plaintiffs injuries, they were acting under color of state law" and should therefore be held liable.[4] *Id.*

Plaintiff takes issue with the Marshall County Jail policy that allows for the onsite presence of a nurse for five hours per day, five days per week (with a nurse being on-call the remainder of the time). *Id.* Plaintiff complains that when an incident occurs when the nurse is not present, the nurse on-call must rely on the information regarding the incident relayed to them by Jail staff, "who are not trained medical professionals." *Id.* Plaintiff argues that, "This gives

---

[4]Plaintiff states, "If defendant's [*sic*] cannot be held liable in their individual capacities, plaintiff argues that he should be allowed to sue defendant's [*sic*] in their official capacities." *Id.* Plaintiff, in his original Complaint, did sue Defendants in both their individual capacities. *See* Docket No. 1. Plaintiff later amended his Complaint, however, and in his Amended Complaint, sued Defendants in their individual capacities only. *See* Docket No. 81. Accordingly, Plaintiff sues Defendants in their individual capacities only.

The undersigned notes that, even if Plaintiff sued Defendants in their official capacities, Plaintiff could not prevail, as in complaints alleging federal civil rights violations under § 1983, "[a]n official capacity claim filed against a public employee is equivalent to a lawsuit directed against the public entity which that agent represents." *Claybrook v. Birchwell*, 199 F.3d 350, 355 n.4 (6th Cir. 2000) (*citing Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). *See also, Frost v. Hawkins County Bd. of Educ.*, 851 F.2d 822, 827 (6th Cir. 1988). As such, when a public employee is sued in his or her official capacity, the claims are essentially made against the public entity. *Id.* In order for the public entity to be subject to liability under § 1983, the plaintiff must plead allegations, *inter alia*, that an "official policy or custom was adopted by the official makers of policy with 'deliberate indifference' towards the constitutional rights of persons affected by the policy or custom." *City of Canton v. Harris*, 489 U.S. 378, 387-388 (1989); *Monell v. Dept. of Soc. Serv.*, 436 U.S. 658, 690-691(1978). Plaintiff has not done so.

the jail staff the ability to downplay the seriousness of an inmates [*sic*] injuries, so the nurse will

wait until the next day to give medical treatment." *Id.* Plaintiff maintains that, "[s]uch was the

circumstance in the instant case," as Corrections Officers Cody Moshier and Rachel Smith both

falsely reported that there appeared to be no active bleeding of Plaintiff's nose and that they

observed Plaintiff laughing and joking around after he was assaulted.[5] *Id.* Plaintiff argues that

the incident was recorded on video surveillance, and takes issue with the fact that Defendant

Patterson states that the Jail no longer has the video surveillance footage of the incident. *Id.*

Plaintiff contends that Defendants Helton and Patterson were aware of the threats made

against Plaintiff because Defendant Patterson admits to being aware of at least two prior

incidents where inmate McKnight was involved in fighting. *Id.* Plaintiff maintains that

Defendants took no action to protect him, either before or after the assault. *Id.*

With regard to Defendant Barron, Plaintiff argues that Defendant Barron is liable because

he "paid inmate McKnight 2 trays of food to break his nose," and because "inmate McKnight

assaulted him because defendant Barron paid him to." *Id.*

Defendants, in their Reply, argue that Plaintiff has asserted no new facts in his Response,

and reiterate their arguments that Plaintiff cannot demonstrate either that his injury was

"sufficiently serious," or that Defendants "subjectively perceived a risk of harm and then

disregarded it." Docket No. 129, p. 2.

With regard to the Affidavits submitted by Plaintiff and his mother to establish that

Defendants knew that Plaintiff was being threatened, but failed to protect him, Defendants

---

[5]Neither Corrections Officer Moshier, nor Corrections Officer Smith, is a Defendant in
this action.

contend that Plaintiff testified that he did not know the names of all the inmates who threatened him, including that of inmate McKnight, and that Plaintiff's mother testified that "some of the inmates" were making threats to Plaintiff. *Id.*, p. 2-3. Defendants acknowledge that they were aware of threats made against Plaintiff by inmate Joey Perryman (held on lockdown), and inmates Kerry Callahan and Billy Roland (both housed in D Pod). *Id.* Defendants reiterate that, at no time prior to the assault was any mention made of inmate McKnight (or of a prisoner called "pork chop," McKnight's nickname). *Id.*, p. 3. Defendants contend that, because Plaintiff himself admitted that he did not mention inmate McKnight being a threat to him, because Plaintiff's mother did not mention inmate McKnight as being a threat to him, and because Defendants took steps to protect Plaintiff from the individuals he specifically reported were a threat to his safety, Plaintiff cannot establish either that Defendants were aware that inmate McKnight was a threat to Plaintiff or that Defendants failed to protect him from known threats. *Id.*

With respect to their position that, in their individual capacities, they are immune from negligence actions, Defendants contend that Plaintiff, in his Response, seems to acknowledge and concede that Defendants are entitled to immunity from suit in their individual capacities. *Id.*, p. 4, *citing* Docket No. 123, p. 3. Defendants argue that Plaintiff's only response to their immunity position is a request to amend his complaint to sue Defendants in official capacities. *Id.* Defendants maintain that this Court denied Plaintiff's Motion to Amend on March 27, 2012, and Plaintiff failed to file specific objections to the Report and Recommendation, and therefore cannot now appeal it. *Id., referencing* Docket No. 121.

Defendants also respond to Plaintiff's discovery arguments, noting that discovery has

been completed and all available requested discovery has been submitted to Plaintiff in a timely manner. *Id.*

For the reasons discussed below, the undersigned recommends that Defendant's Motion for Summary Judgment be GRANTED.

## II. Facts

### A.  Allegations of Plaintiff's Amended Complaint[6]

The allegations of Plaintiff's Amended Complaint, in their entirety, are as follows:

> 1.  The plaintiff contends that on or about March 21st, 2010, he was assaulted by inmate William Mcknight about 6:30 pm, and suffered a broken nose and abrasions on his forehead.
>
> 2.  The plaintiff contends that most of his dinner tray was thrown into [*sic*] the floor by inmate Mcknight during the confrontation. When he pressed the button to the tower and told the shift leader, Rachel Smith, that he needed another tray of food, she refused to give him another tray leaving the plaintiff hungry and in pain.
>
> 3.  The plaintiff would contend that the marshall county jail feeds inmates 2 meals a day, so the plaintiff had to wait another 12 hours before receiving another meal.
>
> 4.  The plaintiff contends that he pressed the button to the tower and told Rachel Smith that his nose was broken and bleeding and he needed to go to the emergency room.
>
> 5.  The plaintiff contends that Rachel Smith called the jail's nurse on 3/21/2010 and notified her that the plaintiffs nose was broken and bleeding.  The nurse said she would see him the next morning. Corrections officers gave the plaintiff an icepack around 7:30 pm, but he received no further medical treatment until about 9:00 am on 3/22/2010.
>
> 6.  The plaintiff contends that he receives x-rays of his head on or

---

[6] These "facts" are provided for background informational purposes.  They are not in a form required by Fed. R. Civ. P. 56.

about 3/22/2010, and was told that his nose was fractured about 12:00 pm. Dr. Matthews told the plaintiff that he would have to go to an ear, nose and throat doctor (E.N.T.), to have his nose reset. Dr. Matthews also told the plaintiff that he would have to get Mrs. Pattersons approval to pay for it.

7. The plaintiff contends that initially Mrs. Patterson refused to send him to an E.N.T. specialist, but did later send him to an E.N.T. specialist to have his nose evaluated.

8. The plaintiff was told by the E.N.T. doctor that his nose had been broken, not fractured. Several months later, he had reconstructive surgery on his nose to repair damage done to the soft tissue of his nose as a direct result of the assault.

9. The plaintiff contends that he was placed in protective custody upon entering the jail and all defendants were aware of the serious threats made to his personal safety.

10. The plaintiff contends that inmate Mcknight was removed from E pod around October 2009 for making threats to him. And knowing this, defendant Patterson still put inmate Mcknight back in protective custody with the plaintiff.

11. The plaintiff contends that the defendants have brought many inmates into protective custody that had violent charges who had no reason for being housed there. This put the plaintiff at serious risk.

12. The plaintiff conteds that on or about 3/22/2010, about 6:00 pm, when corrections officers Bill Harmon and Gary Barrone were passing out dinner trays, officer Barrone went into inmate Mcknights cell with a dinner tray. There was a noise and officer Barrone said he dropped the tray. A trustee then brought another try of food into Mcknights cell.

13. The plaintiff contends that as soon as officers Baronne and Harmon left, inmate John McCall went to Mcknights cell and observed 2 full trays of food. The plaintiff then went to Mcknights cell and observed the same thing.

14. Officer Barrones actions were cruel, unethical, and served no penological purpose.

15.  The plaintiff contends that if the defendants had not been
negligent, his injuries, pain, and suffering would have been
avoided.  And based on reasonable knowledge and belief, contends
that the defendants subjected the plaintiff to these conditions
because of his charges.

16.  The plaintiff contends that all of the named defendants are
exhibiting this type of cruel and discriminative treatment to
inmates with certain types of charges.

17.  The plaintiff contends that the defendants NON-ACTIONS
toward his pleas for medical attention and personal safety is
barbarous, shocking, and cruel and serves no penological purpose.

Docket No. 81. (Headings omitted.  Capitalization, inconsistent spellings, and misspellings in
original.)

## B.  Defendant Patterson's Affidavit

Defendant Patterson is employed by Marshall County as the Administrator of the

Marshall County Jail, and has been employed in that capacity since April of 2009.  Docket No.

117, ¶ 2.  As the Jail Administrator, Defendant Patterson is responsible for maintaining non-

medical files on inmates, including Plaintiff, as well as files regarding the Marshall County Jail

in general, and those files are maintained in the normal scope and course of business of Marshall

County.  *Id*., ¶ 3.

On August 18, 2009, Plaintiff was booked into the Marshall County Jail on two counts of

a rape of a child between the age of 3 and 13.  *Id.*, ¶ 4.  At all times relevant to the case at bar,

Plaintiff resided in E Pod within the Marshall County Jail.  *Id.*, ¶ 5.  E Pod is used for housing

sexual offenders and other offenders whose charges draw unwanted attention from other inmates

or are sufficiently serious to warrant segregation from the general population.  *Id.*  The cells in E

Pod are also used to house prisoners who are segregated as a matter of discipline.  *Id.*

On March 2, 2010, Plaintiff made a written report to Defendant Patterson's attention

alleging that other inmates were making threats against him. *Id.*, ¶ 9. Plaintiff's report stated,

"Sabrina, Joey Perryman, who is locked down in our pod and Kerry Callahan, Billy Roland and

other people who I do not know in D Pod are making serious threats to me if they come in

contact with me in the hallway or in transit to court. I wanted you to be aware of this." *Id.*,

*citing* Exhibit 1, Inmate Request Form.

On March 3, 2010, Defendant Patterson responded to Plaintiff, "Nobody is going to hurt

you. We are taking all measures to make sure of this. If you have any more problems, let me

know." *Id.*, ¶ 10.

On March 22, 2010, around dinnertime, corrections officers Smith and Harmon observed

inmates "horse playing" in E Pod.[7] *Id.*, ¶ 11. At around 6:30 p.m., Plaintiff asked for medical

attention for his "broken nose" and pain. *Id.* Corrections Officer Moshier went to E Pod to

check on Plaintiff. *Id.* Officer Moshier observed a small cut on the bridge of Plaintiff's nose

and reported that there appeared to be no active bleeding. *Id.* Officer Moshier contacted the

Nurse on call regarding the injury to Plaintiff's nose. *Id., citing*, Exhibit 2, Incidents Reports

from on duty correctional officers.

On March 22, 2010, Nurse Felicia McGee was the Nurse on call.[8] *Id.*, ¶ 12. Nurse

McGee was contacted by Officer Moshier regarding Plaintiff's nose injury. *Id.* Nurse McGee

ordered that Plaintiff be given an ice bag. *Id.* Corrections Officer Rachel Smith gave Plaintiff an

---

[7]This date appears to be a typographical error, as the records demonstrate that the incident in question occurred on March 21, 2010. This typographical error is not, however, material to the issues before the Court.

[8]This date appears to be a typographical error, as the records demonstrate that the incident in question occurred on March 21, 2010. This typographical error is not, however, material to the issues before the Court.

ice bag.  *Id.*

On March 24, 2010, Plaintiff made one written request to have photographs taken of his nose.  *Id.*, ¶ 13.  On March 25, 2010, photographs were taken of Plaintiff's nose.  *Id.*, ¶ 14.

Plaintiff's first appointment with an ear, nose, and throat specialist was made for April 16, 2010, with Dr. Stewart at Columbia ENT.  *Id.*, ¶ 15.  For security reasons, Plaintiff was not made aware of his appointment date.  *Id.*, ¶ 16.

On May 27, 2010, Plaintiff saw a second specialist, Dr. Marvel, for a second opinion regarding the condition of Plaintiff's nose.  *Id.,* ¶ 17.

On June 24, 2010, Marshall County secured and paid for reconstructive surgery on Plaintiff's nose, which was performed by Dr. Stewart of Columbia ENT.  *Id.*, ¶ 18.

Pursuant to the Orders of Nurse McGee, Plaintiff was placed in an isolation cell for a period of several weeks before and after having surgery.  *Id.*, ¶ 19.

In his time at the Marshall County Jail, Plaintiff never filed any written complaints about inmate McKnight.  *Id.*, ¶ 6.

As Jail Administrator, Defendant Patterson never had any conversation with Sgt. Kerbo or any other correctional officer, or with Plaintiff, regarding a possible issue between Plaintiff and inmate McKnight (*id.*, ¶ 7), and inmate McKnight had been placed in E Pod on other occasions without incident (*id.*, ¶ 8).

## C.  Affidavit of Felicia McGee

Nurse McGee is employed by Southern Health Partners as the Licensed Practical Nurse
of

the Marshall County Jail, and has been employed as such since March of 2010.  Docket No. 118,

¶ 2.  As the Jail Nurse, Nurse McGee is responsible for maintaining medical files of inmates, including Plaintiff, and those files are maintained in the normal scope and course of business of Marshall County.  *Id.*, ¶ 3.

On March 21, 2010, Nurse McGee received a phone call around 7:19 pm from Correctional Officer Bill Harmon.  *Id.*, ¶ 4.  Officer Harmon explained that Plaintiff and another inmate had been in an altercation.  *Id.*  Plaintiff complained about his nose and was described as alert, breathing, standing, and talking.  *Id.*  Officer Harmon reported that Plaintiff's nose was not bleeding at that time.  *Id.*  Nurse McGee advised that she would assess Plaintiff in the morning, and further advised to give Plaintiff an ice pack.  *Id.*

On March 22, 2010, Nurse McGee assessed Plaintiff and documented his pulse, heart rate, and blood pressure as all within normal limits.  *Id.*, ¶ 5.  Plaintiff's pupils were equal, round, and reacted to light and accommodation.  *Id.*  Nurse McGee noted a bruise on the bridge of Plaintiff's nose, and, upon further assessment, noted that Plaintiff had sustained two black eyes.  *Id.*  Plaintiff complained of a headache and dizziness, so Nurse McGee called Dr. Mathews, the physician.  *Id., citing* Exhibit A, Inmate Sick Call Slip.  Dr. Mathews ordered an x-ray of Plaintiff's nasal bones, and gave verbal orders to apply ice every 10 minutes of each hour and to give Ibuprofen 800 mg by mouth twice daily for 10 days.  *Id.*, ¶ 6.  Per Dr. Mathews order, Plaintiff started Ibuprofen 800 mg that day; Plaintiff was administered his Ibuprofen 800 mg twice daily for 10 days (until and including April 4, 2010).  *Id.*

Also per Dr. Mathews order, Nurse McGee ordered an x-ray through Quality Mobile X-Ray.  *Id.*, ¶ 6.  The x-ray was performed the same day, and Nurse McGee received a report with the x-ray results at 11:48 am the same day via fax.  *Id.*  The x-ray revealed clear nasal sinuses

and normal bone mineralization, as well as an essentially non-displaced fracture through the mid-portion of the nasal bone. *Id.* Nurse McGee alerted the physician of the x-ray findings, and also relayed all the information to the Jail Administrator. *Id., citing* Exhibit B, Documentation from Quality Mobile X-Ray Service.

On March 23, 2010, Plaintiff submitted an Inmate Medical Request for the physician to give him something to help him sleep. *Id.*, ¶ 7. Plaintiff reported difficulty sleeping because of the discomfort of his nose. *Id.* Plaintiff stated that this problem had persisted for 2 days. *Id.* Nurse McGee followed up with Plaintiff regarding the status of his nose. *Id.* Documentation reflected observable reduced swelling of the nose. *Id.* Nurse McGee administered continued treatment with Ibuprofen and ice packs. *Id., citing* Exhibit C, Inmate Sick Call Slip.

Plaintiff was assessed by Dr. Mathews on March 25, 2010. *Id.*, ¶ 8. Dr. Mathews' documentation reflected no subcu bruising around the eyes. *Id.* Dr. Mathews arranged for an ENT to check for the need for surgery. *Id.* Dr. Mathews diagnosed a deviated nasal septum. *Id.* Nurse McGee made an appointment to see the ENT on April 16, 2010. *Id., citing* Exhibit C.

On April 16, 2010, ENT Dr. Robert Stewart assessed Plaintiff for consultation and evaluation. *Id.*, ¶ 9. Dr. Stewart reported a deviated nasal septal fracture and advised an open repair nasal fracture as treatment. *Id.* Dr. Stewart scheduled appointment times for a pre-op evaluation on April 22, 2010, and surgery on April 26, 2010. *Id.* Nurse McGee relayed this information to the Jail Administrator. *Id.* The Jail Administrator wanted a second opinion, so Nurse McGee began researching an ENT physician to render a second opinion. *Id., citing* Exhibits D and E, Patient Outside Referral Form and pre-operative instructions from Dr. Stewart.

On April 29, 2010, Plaintiff submitted an Inmate Medical Request asking if Nurse

McGee was still sending him to Dr. Stewart to get the cartilage in his nose repaired. *Id.*, ¶ 10.

Nurse McGee answered Plaintiff's Medical Request on April 29, 2010, stating, "yes, we are still

taking care of that." *Id.*, *citing* Exhibit F, Inmate Request Form.

On May 10, 2010, Nurse McGee called a Nashville ENT and left a message regarding an

available appointment. *Id., citing* Exhibit G, Progress Notes. On May 12, 2010, Nurse McGee

again called the Nashville ENT, but there was no appointment available until July. *Id.,* ¶ 12,

*citing* Exhibit G. Nurse McGee called another ENT, Dr. Marvel, and an appointment was

scheduled. *Id.*

On May 27, 2010, ENT Dr. Marvel assessed Plaintiff and rendered a second opinion. *Id.*,

¶ 13. Dr. Marvel diagnosed a right septal deviation and recommended a CT scan of Plaintiff's

sinuses with a probable nasal septum reconstruction. *Id.*, *citing* Exhibit H, Patient Outside

Referral Form.

On June 22, 2010, Plaintiff went for a pre-op visit with Dr. Stewart in Columbia, TN. *Id.,*

¶ 14. Dr. Stewart prescribed an antibiotic, Keflex, and Darvocet every 4-6 hours as needed for

pain. *Id.*, *citing* Exhibits I and J, Patient Outside Referral Form and Printed Prescriptions for

Columbia ENT. On June 23, 2010, Plaintiff's prescriptions were filled accordingly at H&S

Pharmacy in Lewisburg, TN. *Id.*, ¶ 15. On June 23, 2010, Plaintiff started Keflex (antibiotic)

500 mg by mouth 2 capsules twice daily x 10 days. *Id.*, ¶ 22. He took Keflex until July 3, 2010,

when the prescription was finished. *Id.* On June 24, 2010, Plaintiff started Prop/APAP

(Darvocet) l00-tiSOmc by mouth 2 tablets twice daily until June 30, 2010, when the prescription

was finished. *Id.*, ¶ 21. Plaintiff was given the medication in accordance with the policy and

procedures of Marshall County Jail, Southern Health Partners, and the Medical Director. *Id.* ¶

15, *citing* Exhibit K, Filled Prescriptions.

On June 24, 2010, Plaintiff had outpatient surgery to repair his deviated septum at Maury Regional Medical Center in Columbia, TN. *Id.*, ¶ 16. The medical staff followed discharge instructions, including a follow-up appointment to occur within 2 weeks. *Id.* Plaintiff received a prescription which provided Lortab 7.5 mg to take by mouth 1-2 tablets every 6 hours as needed for pain. *Id.*, *citing* Exhibit L, Medical Records from Maury Regional Hospital. Plaintiff was placed in isolation for observation, both before and after his surgery. *Id.*, ¶ 19.

On June 30, 2010, after Plaintiff's Darvocet prescription was complete, a prescription for Lortab 7.5 mg was filled, and administered to Plaintiff as 7.5-500 mg by mouth 1-2 tablets twice daily as needed from July 1 though July 5, 2010, in accordance with the policy and procedures of Marshall County Jail, Southern Health Partners, and the Medical Director. *Id.,* ¶¶ 17, 23, *citing* Exhibit M, Filled Prescription Record.

On July 8, 2010, Dr. Stewart assessed Plaintiff as a follow-up appointment to Plaintiff's surgery. *Id.*, ¶ 18. Dr. Stewart's findings were within normal limits, and Dr. Stewart gave medical clearance for Plaintiff. *Id.* Dr. Stewart did not request to assess Plaintiff again. *Id.*, *citing* Exhibit N, Patient Outside Referral Form.

**D. Plaintiff's Affidavit[9]**

Around February 2010, Plaintiff started receiving threats from inmates in other cell blocks. Docket No. 125. Plaintiff did not know all names of the people who were threatening him, and did not know inmate McKnight's name, but the threats became more serious and

---

[9]Although contained in an Affidavit, some of the "facts" stated by Plaintiff in his Affidavit are inadmissable hearsay, and are recounted herein for contextual purposes.

Plaintiff was concerned for his safety.  *Id.*   On March 1, 2010, Plaintiff wrote a request to

Defendant Patterson informing her generally about the threats made against him by inmates from

other cell blocks.  *Id.*  Plaintiff also had his mother speak to Defendant Helton about the threats

that he was receiving from unnamed inmates.  *Id.*

Plaintiff was housed in E Pod, but not placed in "23/1 protective custody" or segregated

from the other inmates.  *Id.*

Plaintiff, inmate McKnight, and two other inmates were playing cards, when inmate

McKnight "began to harass [Plaintiff], but quit a moment later."  *Id.*  About an hour later, at

dinnertime, inmate McKnight "began harassing" Plaintiff again.  *Id.*  Specifically:

> [inmate McKnight] put his fork in my food and did so several
> times.  I then pushed his hand away and he dropped his fork.  He
> threw his tea on me and I threw my tea on him.  He got up and put
> his tray of food by the door and came back to the table and threw
> my food on the floor.  He came at me and started swinging
> punches.  He missed me and walked away for a moment.  He then
> came back at me and started swinging punches again.  He
> connected with the bridge of my nose and I immediately knew my
> nose was broken.  Another inmate stepped in and stopped the
> assault.  My nose was bleeding continuously from a cut on the
> bridge.

*Id.*

Plaintiff pressed the button to the tower and told the shift leader, Rachel Smith, that his

nose was broken and bleeding and that he needed medical attention.  *Id.*  He also told her that his

food had been thrown onto the floor and that he needed another tray.  *Id.*  Officer Smith refused

to provide Plaintiff with another tray of food.  *Id.*

Plaintiff also submitted a medical sick call form asking for medical attention.  *Id.*

Plaintiff received an ice pack from jail staff on 3/21/2010, but the jail staff would not administer

any pain medication to Plaintiff without the nurse present.  *Id.*  Plaintiff was not given any pain medication until the following day.  *Id.*

On March 22, 2010, Officers Barron and Harmon were passing out dinner trays.  *Id.* Officer Barron entered inmate McKnight's cell with a food tray.  *Id.*  Officer Barron came back out, said that he dropped the tray, asked a trustee for another one, and took the second tray into inmate McKnight's cell.  *Id.*  Officer Barron did not bring the spilled tray out with him.  *Id.*

Upon hearing a report from inmate John McCall that inmate McKnight was eating two trays of food, Plaintiff looked into inmate McKnight's cell and observed him eating two trays of food.  *Id.*  Later, Plaintiff heard inmate McKnight bragging to other inmates that Officer Barron gave him two trays of food to hit Plaintiff.  *Id.*

Plaintiff did not immediately tell Officer Smith that it was inmate McKnight who assaulted him was because he was in fear for his safety, as inmate McKnight "was still around [him] at that point, and had threatened [him] not to tell."  *Id.*  Plaintiff waited until after all the inmates were locked down for the night before he told Officer Moshier what had happened.  *Id.* Upon hearing of what happened, Officer Moshier walked over to inmate McKnight and told him that he was back on lockdown.  *Id.*

Plaintiff was not placed in "23/1 protective custody" after being assaulted.  *Id.*

**E.  Affidavit of Deborah Stewart Harris, Plaintiff's Mother**

On "several" occasions in 2010 ("at least one" of which was before Plaintiff's assault), Ms. Harris spoke to Defendant Helton regarding her concerns about "certain issues" Plaintiff was having in jail.  Docket No. 126.  Defendant Helton called Defendant Patterson and Assistant Administrator Joanne Sellers into his office and discussed it with them.  *Id.*  Defendant Helton

assured Ms. Harris that Plaintiff would be fine.  *Id.*

**F.  Plaintiff's Deposition Excerpt Testimony**

Inmate McKnight was first placed in E Pod in October or November 2009.  Docket No. 116-1, p. 22:2-6.  The first occasion that Plaintiff came into contact with inmate McKnight, he felt that he would have trouble out of him.  *Id.*, p. 22:9-23:2.  Plaintiff pressed the call button for help and asked for Sgt. Kerbo.  *Id.*, p. 23:3-7.  Plaintiff advised Sgt. Kerbo that he was having problems with inmate McKnight.  *Id.*  Inmate McKnight was immediately moved out of the Pod. *Id.*; p. 24:16-17.

On March 21, 2010, inmate McKnight was released from lockdown early in the day in E Pod and allowed to roam the Pod.  *Id.*, p. 28:10-20; 29:14-18.  Plaintiff did not press his call button and complain that inmate McKnight was in the Pod.  *Id.*, p. 30:1-8.  Plaintiff did not press his call button until after he was assaulted.  *Id.*, p. 30:6-8.

After Plaintiff was assaulted, he pressed his call button and told Officer Smith that his tray of food had been thrown on the floor, that he had not gotten to eat any of it, that he needed some food, that his nose was broken and bleeding, and that he needed to "see about going to the emergency room."  *Id.*, p. 34:24-35:6.  Plaintiff did not tell Officer Smith that inmate McKnight had assaulted him.  *Id.,* p. 35:4-5.

Officer Smith called the nurse, and Officer Harmon came down "running medicine."  *Id.*, p. 35:7-12.  Plaintiff told Officer Harmon that he thought his nose was broken, but did not tell Officer Harmon that inmate McKnight had assaulted him because inmate McKnight was behind him, and he was afraid.  *Id.*, p. 35:11-25.

Once all the inmates had been locked down for the evening, Officer Moshier came down

and asked Plaintiff what had happened. *Id.*, p. 36:2-8. Plaintiff told Officer Moshier that inmate McKnight had hit him. *Id.* Inmate McKnight was placed on lockdown the following day, and Plaintiff had no further contact with him. *Id.*, p. 36:13-15.

Inmate McKnight had been placed in E Pod on at least 2 or 3 other occasions without incident. *Id.*, p. 26:19-20.

Plaintiff never spoke to anyone else about inmate McKnight. *Id.*, p. 24:21-24. Plaintiff never filled out any complaints about inmate McKnight. *Id.*, p. 24:18-20.

Defendant Patterson asked Plaintiff if he wanted to press charges against inmate McKnight, which he did. *Id.*, p. 39:1-7. Inmate McKnight plead guilty to the assault, and "was convicted of simple assault that day." *Id.*

### III. Analysis

### A. Local Rules 56.01(c) and (g)

With respect to Motions for Summary Judgment specifically, Local Rules 56.01(c) and (g) state, in pertinent part:

> c. Any party opposing the motion for summary judgment must respond to each fact set forth by the movant ...
>
> . . .
>
> g. Failure to respond to a moving party's statement of material facts, or a non-moving party's statement of additional facts, within the time periods provided by these Rules shall indicate that the asserted facts are not disputed for the purposes of summary judgment.

Plaintiff has failed to respond to Defendant's Statement of Undisputed Facts (Docket No. 115). Pursuant to Local Rule 56.01(g), Plaintiff's failure to respond indicates "that the asserted facts are not disputed for the purposes of summary judgment." Accordingly, there are no genuine

issues as to any material fact and all that remains to be determined is whether Defendants are

entitled to a judgment as a matter of law.

## B.  Motion for Summary Judgment

It would be inappropriate to grant Defendants' Motion solely on the ground that Plaintiff

has failed to respond to their Statement of Undisputed Facts.  *See Stough v. Mayville Community*

*Schools*, 138 F.3d 612, 614 (6th Cir. 1998).  As the Sixth Circuit has stated:

> [A] district court cannot grant summary judgment in favor of the
> movant simply because the adverse party has not responded.  The
> Court is required, at a minimum, to examine the movant's Motion
> for Summary Judgment to ensure that he has discharged [his
> initial] burden ...  The federal rules require that the party filing a
> Motion for Summary Judgment "always bears the burden of
> demonstrating the absence of a genuine issue as to a material fact."

*Id.* (citations omitted).  The Court will, therefore, consider whether Defendants have met their

burdens under the appropriate summary judgment standards discussed below.

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate only "if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law."  A dispute is "genuine" only if "the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

In order to prevail on a Motion for Summary Judgment, the moving party must meet the

burden of proving the absence of a genuine issue as to material fact concerning an essential

element of the opposing party's claim.  *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548,

2553, 91 L. Ed. 2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.

1989).  In determining whether the moving party has met its burden, the Court must view the evidence in the light most favorable to the nonmoving party.  *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

Fed. R. Civ. P. 56 provides that the nonmoving party may not rest upon the mere allegations or denials of his or her pleading, but his or her response, by affidavits or otherwise, must set forth specific facts showing that there is a genuine issue for trial.  If a nonmoving party, however, fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there is no genuine issue as to any material fact because a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  *Celotex*, 477 U.S. at 322-23, 106 S. Ct. at 2552, 91 L. Ed. 2d at 273.  When this occurs, the moving party is entitled to summary judgment as a matter of law.  *Id.* at 322-23, 106 S. Ct. at 2552; *Williams v. Ford Motor Co.,* 187 F.3d 533, 537-38 (6th Cir. 1999).

## C.  42 U.S.C. § 1983

Plaintiff alleges violations of his rights pursuant to 42 U.S.C. §1983.  *See* Docket No. 1. Section 1983 provides, in part, that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

Thus, in order to state a claim under §1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged

deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48, 108 S. Ct. 2250, 2254-55 (1988)*, citing Parratt v. Taylor,* 451 U.S. 527, 535, 101 S. Ct. 1908, 1913, 68 L. Ed. 2d 420 (1981) (overruled in part on other grounds, *Daniels v. Williams,* 474 U.S. 327, 330-331, 106 S. Ct. 662, 88 L. Ed. 2d 662 (1986)); *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 155, 98 S. Ct. 1729, 1733, 56 L. Ed. 2d 185 (1978). The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49, 108 S. Ct. 2255*, quoting United States v. Classic,* 313 U.S. 299, 326, 61 S. Ct. 1031, 1043, 85 L. Ed. 1368 (1941).

## D. The Case At Bar

As has been discussed above, Plaintiff sues former Marshall County Sheriff Les Helton, Marshall County Jail Administrator Sabrina Patterson, and former Marshall County Jail Correctional Officer Gary Barron, in their individual capacities, for violations of his constitutional rights under 42 U.S.C. §1983.

As an initial matter, Plaintiff does not even mention Defendant Helton in the factual allegations of his Amended Complaint, either by name or by his position as Sheriff. *See* Docket No. 81. For this reason alone, Defendant Helton is entitled to a judgment as a matter of law.

Moreover, the undisputed facts demonstrate that, although Plaintiff and his mother complained that inmates had threatened Plaintiff, neither Plaintiff nor his mother ever reported to Defendant Helton that inmate McKnight was one of those inmates who had threatened him. Absent any such knowledge, Defendant Helton cannot be held liable for any failure to protect Plaintiff from inmate McKnight.

Similarly, Plaintiff has failed to allege that Defendant Helton knew of Plaintiff's injuries, much less delayed, denied, or in any way interfered with Plaintiff's receipt of medical care for those injuries. Absent such, Defendant Helton cannot be liable for any alleged deliberate indifference. Additionally, the undisputed facts demonstrate that Plaintiff received timely medical care for his injuries, was treated by the Jail nurse and physician, saw two ENT specialists, underwent surgery, and received his medications as ordered.

There are no genuine issues of material fact with regard to Defendant Helton, and Defendant Helton is entitled to a judgment as a matter of law.

With regard to Defendant Patterson, the allegations against her contained in Plaintiff's Amended Complaint are simply that: (1) Dr. Mathews told Plaintiff that Defendant Patterson would need to approve the County's paying for Plaintiff's visit to an ENT specialist to have his nose reset; (2) Defendant Patterson initially refused to send Plaintiff to an ENT specialist; (3) Defendant Patterson did later send Plaintiff to an ENT specialist to have his nose evaluated; and (4) Defendant Patterson put inmate McKnight in the same Pod as Plaintiff knowing that inmate McKnight had been removed from E Pod around October 2009 for making threats to Plaintiff.

With respect to Plaintiff's deliberate indifference claim, the undisputed facts (including Plaintiff's own testimony) demonstrate that Defendant Patterson approved visits for Plaintiff with two different ENT specialists, and approved for Plaintiff's reconstructive surgery. It is undisputed that Plaintiff received medical care, and Plaintiff simply cannot establish deliberate indifference on the part of Defendant Patterson.

Plaintiff's Amended Complaint avers that Defendant Patterson was aware that inmate

McKnight had been removed from E Pod around October 2009 for making threats to Plaintiff, but nevertheless put inmate McKnight and Plaintiff in the same Pod.  The undisputed facts (including Plaintiff's own testimony), however, demonstrate that Plaintiff had complained only generally to Defendant Patterson that inmates had threatened him; that the only specifically named inmates of which Plaintiff complained were Joey Perryman, Kerry Callahan, and Billy Roland; that Defendant Patterson was responsive to Plaintiff's concerns and kept the named inmates away from Plaintiff; that Sgt. Kerbo was the only Correctional Officer to whom Plaintiff had complained of inmate McKnight; and that Defendant Patterson had not been informed by Sgt. Kerbo of any threat or issue between Plaintiff and inmate McKnight.  Because the undisputed facts demonstrate that Defendant Patterson was not aware that inmate McKnight had threatened Plaintiff (or that Plaintiff and inmate McKnight had any type of issues), Defendant Patterson cannot be held liable for any alleged failure to protect.

There are no genuine issues of material fact with regard to Defendant Patterson, and Defendant Patterson is entitled to a judgment as a matter of law.

With regard to Defendant Barron, the sole allegations against him in Plaintiff's Amended Complaint are that, on March 22, 2010, Defendant Barron gave inmate McKnight two trays of food.  Although Plaintiff complains that Defendant Barron's "actions were cruel, unethical, and served no penological purpose," giving a different inmate an extra tray of food does not amount to a constitutional violation.  Absent a constitutional violation, there is nothing under 42 U.S.C. §1983 for which Defendant Barron can be liable.  Accordingly, Defendant Barron is entitled to a judgment as a matter of law.

### IV. Conclusion

For the forgoing reasons, there is no genuine issue of material fact and Defendants are entitled to a judgment as a matter of law. Accordingly, the undersigned recommends that Defendants' Motion for Summary Judgment be GRANTED, and that this action be DISMISSED WITH PREJUDICE.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has fourteen (14) days after service of this Report and Recommendation in which to file any written objections to this Recommendation with the District Court. Any party opposing said objections shall have fourteen (14) days after service of any objections filed to this Report in which to file any response to said objections. Failure to file specific objections within fourteen (14) days of service of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation. *See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied*, 474 U.S. 1111 (1986); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

_____
E. CLIFTON KNOWLES
United States Magistrate Judge